**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **MAX MCCOY, (R58593),** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 20-cv-606** |
| **v.** | ) | |
| | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **MATTHEW PLUMMER,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Petitioner Max McCoy ("McCoy" or "petitioner"), an inmate at the Menard Correctional Center, brings this second amended habeas corpus action, (Dckt. #96), against respondent Matthew Plummer (the current warden at Menard), pursuant to 28 U.S.C. §2254, to challenge his June 19, 2006 conviction of first-degree murder, aggravated discharge of a firearm, and aggravated unlawful use of a weapon in the Circuit Court of Cook County.[1]  In his petition, filed on September 26, 2023, McCoy raises four claims, alleging that: (1) trial counsel was ineffective for failing to pursue the defenses of insanity or voluntary intoxication; (2) sentencing counsel was ineffective for failing to present mitigating evidence of McCoy's mental health history; (3) McCoy's arrest violated the Fourth Amendment because it was based on an investigative alert; and (4) prosecutors erroneously presented inaccurate testimony to the grand jury.  McCoy has since withdrawn his Fourth Amendment claim, leaving only three claims for this Court's review. (*See* Dckt. #121 ¶8).

---

[1] This Court has jurisdiction over petitioner's 28 U.S.C. §2254 petition for a writ of habeas corpus pursuant to 28 U.S.C. §§1331, 2241, and 2254.  Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk's Office is ordered to substitute Warden Matthew Plummer as the respondent in this matter. *See Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir. 1996).

For the reasons set forth below, the Court denies the petition and declines to issue a certificate of appealability.

## I. BACKGROUND

The Court draws the following factual history from the Illinois Appellate Court opinions, *People v. McCoy*, No. 1-07-0784 (Ill.App.Ct. Nov. 6, 2013) (attached as Dckt. #111-4); *People v. McCoy*, No. 1-16-0595 (Ill.App.Ct. June 11, 2019) (attached as Dckt. #111-9); *People v. McCoy*, 2012 ILApp (1st) 170299-U (Ill.App.Ct. June 29, 2021) (attached as Dckt. #111-14); *People v. McCoy*, No. 1-20-1130 (Ill.App.Ct. Nov. 1, 2022) (attached as Dckt. #111-16).   State court factual findings, including facts set forth in a state court appellate opinion, have a presumption of correctness, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.   28 U.S.C §2254(e)(1); *Tharpe v. Sellers*, 583 U.S. 33, 34 (2018) ("[The state court's] factual determination is binding on federal courts . . . in the absence of clear and convincing evidence to the contrary."); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018).   The Court draws additional procedural history from the state court record, (Dckt. #111, *et seq.*).

### A. The Incident

At a bench trial that commenced on June 12, 2006, McCoy was found guilty of first-degree murder, aggravated discharge of a firearm, and aggravated unlawful use of a weapon (AUUW), arising from an incident in which then-eighteen-year-old Natasha Williams was shot and killed as she sat in a car with her friends Carl White, Shamea Green, and Alfred Harris. (Dckt. #111-4).

According to trial testimony from Philip Austin, Austin encountered McCoy on his way to the store on December 15, 2004.   (*Id.* at 5).   Austin knew McCoy "from the neighborhood."

(*Id.*).   The two had walked together for "about half a block" when McCoy separated from Austin, walked to the rear passenger side of a car parked on the street, pulled a gun out of his sweatshirt pocket, and fired two shots into the car.   (*Id.*).   As the car pulled away, McCoy fired three more shots and ran away.   (*Id.*).   McCoy was arrested the following day.   (*Id.* at 2).

On cross-examination, Austin denied that he had the gun and that he and McCoy had planned to rob the individuals in the car for drug money.   (*Id.* at 6).   White and Green, who were in the car with Williams when she was killed, corroborated Austin's testimony that McCoy possessed the gun and was the shooter.   (*Id.*).   After the shooting, they both identified McCoy as the shooter from a photo array, and Green identified McCoy as the shooter from a lineup the following day.   (*Id.*).   While the gun used in the murder was never recovered, forensic experts recovered six cartridge casings from the scene, three of which were fired from a single weapon. (*Id.*).

As part of his defense, McCoy testified that Austin was the shooter; that McCoy never held the gun; that he and Austin had planned to rob people for drug money; and that their plan was for Austin to hold people at gunpoint while McCoy got their cash.   (*Id.* at 7–8).   When McCoy saw Austin "do the shooting," he ran in a separate direction from Austin.   (*Id.* at 8).   In finding McCoy guilty at the conclusion of his trial, the court found his testimony that he did not shoot Williams unsupported and contrary to the other eyewitness accounts.   (Dckt. #111-18 at 56).

### B.     Pretrial Proceedings

Before trial, McCoy was represented by David Jordan.   (Dckt. #111-4 at 2).   On May 5, 2005, five months after the incident, Jordan moved for a psychiatric evaluation regarding "[McCoy's] fitness to stand trial and/or the defense of insanity at the time of the incidents in

question." (*Id.*). Jordan noted that a month prior to the shooting, McCoy had attempted suicide and been involuntarily committed to Chicago-Read Mental Health Center, where he was treated with psychotropic medications. (*Id.*). At the hearing on the motion, Jordan noted that McCoy had disclosed to him an "extensive ecstasy habit"; "regular marijuana use"; and his use of psychotropic medications, including Risperdal. (*Id.*). Jordan also expressed concern about the combined effect of McCoy's drug use and psychotropic medication on his ability to appreciate the criminality of the charged crimes. (*Id.* at 2–3). The trial court ordered a behavioral clinical examination to assess McCoy's fitness to stand trial, but not his sanity at the time of the offense. (*Id.* at 3).

On July 21, 2005, Dr. Nishad Nadkarni performed a psychiatric examination on McCoy and concluded that he was fit to stand trial with medications. (Dckt. #111-21 at 737). He diagnosed McCoy with depressive disorder, polysubstance dependence, and antisocial personality disorder, and noted a past psychiatric history including depression, a prior suicide attempt that resulted in hospitalization, and prior indications of unspecified personality disorder. (*Id.* at 735). Dr. Nadkarni noted that "[u]pon questioning, [McCoy] denies any history of psychotic symptoms, although he had reported auditory hallucinations to previous examiners" during his November 2004 inpatient psychiatric hospitalization. (*Id.*). Dr. Nadkarni's report was provided to the state trial court on August 24, 2005. (Dckt. #111-4 at 3).

On October 5, 2005, Jordan moved to continue McCoy's case to seek funds to retain an expert psychiatric witness. (*Id.*). On January 26, 2006, Jordan disclosed that he sought a doctor's testimony to address McCoy's history of suicide attempt and involuntary hospitalization. (*Id.* at 3–4). When the court asked whether Jordan was contemplating an insanity defense, Jordan replied, "No. Very clearly, my client understands exactly what is going

4

on now. . . .   Right now as he stands here he is fine."   (*Id.* at 4).

### C.      Posttrial Proceedings

After McCoy was found guilty at his bench trial, he filed a complaint against his attorney with the state disciplinary commission.   (Dckt. #111-4 at 9).   The trial court granted Jordan leave to withdraw, and Assistant Public Defender Daniel Kiss was appointed to represent McCoy.   (*Id.*).   Kiss filed a posttrial motion alleging several grounds of ineffective assistance of counsel, none of which concerned McCoy's mental health, fitness, or sanity.   (*Id.* at 9–10).

In an interview completed as part of his presentence investigative report, McCoy stated that he largely "raised himself" as a child, that his mother openly used drugs and worked as a prostitute while he and his sister lived at home, and that he started selling marijuana at age eleven to help provide for his younger sister.   (Dckt. #111-21 at 299).   He explained an incident in 2002 when his mother's boyfriend kicked him in the face several times with steel-toed boots, after which McCoy required plastic surgery and was hospitalized for about a week.   (*Id.*).   He reported receiving education until sophomore year, and that he was a "straight A student" on the honor roll, sang in the choir, and played on the school's basketball team.   (*Id.* at 300).

McCoy stated that one month prior to the shooting, he "took too much ecstasy" and "went crazy," at which point he attempted suicide and was hospitalized at Chicago-Read Mental Health Center for three weeks.   (*Id.*).   While there, he was diagnosed with bipolar disorder and treated with psychotropic medications.   (*Id.* at 301).   He continued taking the medications until he ran out shortly before the shooting.   (*Id.*).   While McCoy was in pretrial custody, he attempted suicide another time, was hospitalized, and then was prescribed Prozac and two other medications.   (*Id.*).

At sentencing, McCoy presented mitigation testimony from his biological father and his

maternal grandfather. (Dckt. #111-17 at 279–323). McCoy's father stated that he visited McCoy approximately every other weekend when his son was growing up, and that his son had no trouble with the law in his youth. (*Id.* at 291–96). McCoy's maternal grandfather, Gregory Sanford, testified that McCoy had lived with him for two or three years before his arrest. (*Id.* at 298). He testified that McCoy was "in the wrong place at the wrong time," and that McCoy "never had any violence" growing up. (*Id.* at 298–99). Sanford was unaware of certain facts that were included in McCoy's presentence investigative report, including that (1) McCoy's mother was suffering from cancer and (2) that she worked as a prostitute, rather than (as Sanford testified) at the Ford Motor Company. (*Id.* at 300–01). McCoy's defense counsel at sentencing noted McCoy's bipolar diagnosis, his suicide attempt in Cook County Jail, and his tumultuous childhood. (*Id.* at 307–10).

The trial court sentenced McCoy to an aggregate prison term of 65 years. (*Id.* at 319–20). The court noted McCoy's "dysfunctional family life," absence of serious criminal history, and "issues with respect [to] bipolar" as mitigating factors, but noted "far more aggravation" in determining McCoy's sentence. (*Id.* at 317–19).

### D. Direct Appeal

On appeal, McCoy argued that trial counsel was ineffective for "failing to understand the differences between fitness and sanity, and making errors related to those distinct but related legal concepts." (Dckt. #111-4 at 10). The Illinois Appellate Court concluded that McCoy's ineffective assistance of counsel claims were forfeited because McCoy failed to raise them in his posttrial motion. (*Id.* at 10–11). Although the Appellate Court excused McCoy's forfeiture because of the seriousness of his allegations, it found that counsel's failure to pursue an insanity defense did not prejudice him because there was insufficient evidence in the record to support

this defense.   (*Id.*at 10–12).   Accordingly, it concluded that McCoy was not denied effective assistance of counsel.   (*Id.*).

McCoy filed a petition for leave to appeal ("PLA"), which the Illinois Supreme Court denied on March 25, 2009.   (Dckt. #111-5).

### E.      Postconviction Petition

On September 2, 2009, McCoy filed a state postconviction petition *pro se*, alleging in relevant part that trial counsel was ineffective for failing to pursue an insanity defense.   (Dckt. #111-21 at 1425–28).   On April 12, 2012, with representation, McCoy filed an amended postconviction petition, attaching in support a report from Dr. Alexander Obolsky about his mental state at the time of the offense.   (Dckt. #111-22 at 388).   Dr. Obolsky reported that McCoy was experiencing "severe visual and auditory hallucinations consistent with amphetamine psychosis," a result of his ecstasy use "made worse by the concomitant use of the prescription antidepressant Prozac."   (*Id.* at 752).   Dr. Obolsky stated, however, that he "require[d] further evaluation in order to reach a decision with a reasonable degree of medical psychiatric certainty as to Mr. McCoy's mental state at the time of the alleged crime."   (*Id.*).

On July 21, 2015, represented by new counsel, McCoy filed a supplemental postconviction petition, which introduced a claim that sentencing counsel was ineffective for failing to introduce mitigating evidence about McCoy's mental health.   (Dckt. #111-21 at 969). McCoy attached to his supplemental petition a report concerning Dr. Michael Kovar's forensic psychological evaluation as to (1) McCoy's mental state at the time of the offense and (2) whether there was mitigating evidence that could have been presented at trial.   (*Id.* at 1058). Dr. Kovar interviewed McCoy; conducted psychological tests and forensic assessments; and

reviewed records from McCoy's arrest and trial, including Dr. Obolsky's report and the interviews he conducted. (*Id.* at 1058–59).

In describing his offense to Dr. Kovar, McCoy noted that he was experiencing "voices of a highly denigrating nature," as well as hallucinations of "demons in the form of black shadows with eyes glowing," the night before the shooting. (*Id.* at 1067). When McCoy encountered Austin, he reportedly heard "voices whispering," which he needed drugs to quiet. (*Id.* at 1068). "I told Phil I didn't want to hurt nobody," he told Dr. Kovar, and that "we was supposed to get pills to help me make the voices go away and help me stop from seein' things." (*Id.*).

At the conclusion of his over thirty-page report, Dr. Kovar opined that although "Defendant could not *fully* appreciate the wrongfulness of his conduct at the time of the offense," he was "not able to determine with reasonable psychological certainty whether [McCoy] . . . lacked substantial capacity to appreciate the criminality of his conduct at the time of the offense." (*Id.* at 1085–86) (emphasis added). McCoy had explained to Dr. Kovar "that he hatched a plan with Phillip Austin to rob people of drugs and/or money in which his main role was to be the look-out," and that "he indicated he would look out for police because of not wanting to get caught." (*Id.* at 1086). "This suggests," Dr. Kovar reported, that "he was trying to evade apprehension and as such could appreciate wrongfulness." (*Id.*). Across the numerous psychological tests that Dr. Kovar conducted, he noted several instances in which McCoy appeared to be "not giving the test a sincere effort," "exaggerating," or "overreporting symptomatology." (*Id.* at 1079, 1081). He also noted one instance in which McCoy explained that, when he was kept at Chicago-Read, he had lied about experiencing hallucinations so he could leave the facility and get high on his birthday. (*Id.* at 1069).

8

In discussing mitigation, Dr. Kovar concluded "that the combined impact of . . . [McCoy's] traumatic past, psychiatric illness, suicide attempts, drug abuse, developmental immaturity, and severe cognitive deficits would likely have predisposed him to a high degree of compromised functioning." (*Id.* at 1088). Dr. Kovar noted, in particular, McCoy's upbringing in the Chicago Housing Projects, history of drug dealing, chronic drug abuse, chronic depression, and suicide attempts. (*Id.* at 1087–88). Dr. Kovar diagnosed McCoy with, *inter alia*, psychotic and depressive disorders not otherwise specified. (*Id.* at 1084).

In January 2016, the state trial court dismissed McCoy's postconviction petition. (Dckt. #111-21 at 175). The court found his ineffective assistance of counsel claim about the insanity defense barred by *res judicata* because the Illinois Appellate Court had addressed it on direct appeal. (*Id.* at 168). In the alternative, the court found McCoy's claim meritless, because McCoy had not presented evidence that the outcome of his trial would have been "favorably different" if his counsel had presented an insanity defense. (*Id.*). The trial court also found McCoy's mitigation claim meritless because he failed to present evidence that, if presented at sentencing, would have mitigated his culpability. (*Id.* at 172–73).

On appeal, McCoy's appointed appellate counsel moved to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), after determining that any appeal lacked arguable merit. (Dckt. #111-6). The Illinois Appellate Court "f[ou]nd no issue of arguable merit," granted counsel's *Finley* motion, and dismissed McCoy's appeal. (Dckt. #111-9).

**F.     Successive Postconviction Petition**

On March 16, 2020, McCoy filed a motion for leave to file a successive postconviction petition, seeking to raise claims related to his allegations that his arrest violated the Fourth Amendment because it was based on an investigative alert. (Dckt. #111-23). On September

9

21, 2020, the state trial court denied McCoy leave to file.   (Dckt. #111-24).   On November 1, 2022, the Illinois Appellate Court dismissed McCoy's subsequent appeal.   (Dckt. #111-16).

### G.       Additional State Court Proceedings

In February and June 2016, while his initial postconviction proceedings were pending, McCoy filed *pro se* petitions for relief from judgment pursuant to 735 ILCS 5/2-1401 (Section 2-1401 petitions) alleging that his conviction was void because (1) the prosecutor presented false testimony to the grand jury, violating McCoy's due process rights; (2) McCoy received a firearm enhancement based on a statute not in effect at the time of his offense; and (3) two of McCoy's convictions violated the one-act, one-crime doctrine.   (Dckt. #111-21 at 1265–80, 1313–22). On September 14, 2016, the state trial court granted in part and denied in part McCoy's Section 2-1401 petitions, finding his one-act, one-crime claim meritorious, but his other claims not. (Dckt. #111-14 ¶13).   On June 29, 2021, the Illinois Appellate Court affirmed the lower court's denial of McCoy's remaining Section 2-1401 claims—including his claims about the prosecutor presenting false testimony to the grand jury—because his petitions were untimely filed and fell within no exception to the relevant limitations period.   (*Id.* ¶¶17–23).   The Illinois Supreme Court denied McCoy's subsequent PLA, in which he reasserted his grand jury claim.   (Dckt. #111-15).

### H.       Federal Petition

On January 27, 2020, McCoy filed a *pro se* petition for federal habeas corpus relief raising two claims: (1) ineffective assistance of trial counsel due to trial counsel's misunderstanding of the difference between fitness to stand trial and insanity at the time of the offense; and (2) ineffective assistance of sentencing counsel, due to sentencing counsel's failure to present mitigating mental health evidence.   (Dckt. #1).

10

On June 4, 2021, McCoy—now represented—filed an amended petition for federal habeas relief that alleged the same initial claims and two additional claims: (1) that his arrest violated the Fourth Amendment because it was based on an investigative alert, and (2) that prosecutors erroneously presented false testimony to the grand jury. (Dckt. #38). On September 26, 2023, he filed the instant second amended petition for federal habeas relief, alleging the same four claims. (Dckt. #96).

## II. ANALYSIS

Having withdrawn one of his claims in his reply, McCoy now pursues the following claims: that (1) trial counsel was ineffective for failing to pursue the insanity defense; (2) sentencing counsel was ineffective for failing to present mitigating evidence of McCoy's mental health history; and (3) prosecutors erroneously presented inaccurate testimony to the grand jury. Respondent argues, in its answer, that petitioner's first and second claims are meritless, and that his third claim is untimely. (Dckt. #17). As explained further below, the Court agrees with respondent.

### A. McCoy's Third Claim Is Untimely.

A state prisoner filing a federal habeas corpus petition must do so within the one-year statute of limitations imposed by 28 U.S.C. §2244(d)(2). That period begins to run from the latest of certain dates set forth in the statute, including, as relevant here, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. §2244(d)(1)(A). The Supreme Court has held that Section 2244(d)(1)(A) is comprised of two prongs—the "conclusion of direct review" and the "expiration of the time for seeking such review"—each of which "relates to a distinct category of petitioners." *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). For McCoy, who did not appeal

11

the Illinois Supreme Court's denial of his direct appeal PLA, judgment became final "when the time for pursuing direct review in [the Supreme] Court, or in state court, expire[d]." *Id.*

McCoy's judgment became final on June 23, 2009, ninety days after the Illinois Supreme Court denied his PLA for his direct appeal on March 25, 2009, when the time for petitioning for a writ of certiorari expired. *See* S.Ct.R. 13.1. The one-year clock was paused when he filed his postconviction petition in state court on September 2, 2009, with 70 days accrued. The clock began again on September 26, 2019, the day after the Illinois Supreme Court denied McCoy's postconviction PLA, at which point McCoy's "application for State post-conviction or other collateral review" was no longer "pending." 28 U.S.C. §2244(d)(2). Finally, the limitations period ran for an additional 295 days until July 17, 2020. McCoy did not file his third habeas claim concerning the grand jury until he filed his first amended habeas petition on June 4, 2021, nearly a year after the statute of limitations expired. Accordingly, that claim is untimely.

**1.      McCoy's initial habeas petition did not toll the limitations period.**

McCoy's initial habeas petition, filed on January 27, 2020, did not toll the one-year statute of limitations. "A properly filed federal habeas petition does not toll the limitation period" because it is not an application for "*State . . .* collateral review." *Duncan v. Walker*, 533 U.S. 167, 172 (2001); 28 U.S.C. §2244(d)(2) (emphasis added). Nor does McCoy's first amended petition for habeas relief relate back to his initial petition. An amended pleading only "relates back" when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed.R.Civ.P. 15(c)(1)(B). An amendment does not relate back, however, merely because it "relate[s] to the same trial, conviction, or sentence as a timely filed claim"; instead, the amendment must be "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 647, 662 (2005).

In his initial habeas petition, filed *pro se*, McCoy only brought claims for ineffective assistance of trial and sentencing counsel. (*See* Dckt. #1 at 5). As McCoy fails to dispute, these claims about his lawyers' failure to pursue an insanity defense at trial or present certain evidence at sentencing are factually unrelated to McCoy's claim about what the prosecutor presented to the grand jury. Accordingly, McCoy's June 2021 amended habeas petition does not relate back to his January 2020 initial habeas petition.

### 2. McCoy's Section 2-1401 petitions did not toll the limitations period.

McCoy's Section 2-1401 petitions did not toll the limitations period for his federal habeas petition, either. The Illinois Appellate Court found that McCoy's claim about prosecutorial misconduct was brought via an untimely Section 2-1401 petition. (*Id.* ¶22). As the State correctly notes, "[a] collateral attack that is untimely under state law is not properly filed" for purposes of tolling the statute of limitations on a habeas claim. *Brooks v. Walls*, 279 F.3d 518, 521 (7th Cir. 2002) (cleaned up). McCoy seems to argue in reply that, because he successfully petitioned for relief under Section 2-1401 related to his one-act, one-crime claim, his other convictions were void, and he should thus be exempt from any statute of limitations on his federal habeas claims. (Dckt. #121 ¶9). This is incorrect; as the Illinois Appellate Court correctly held, his remaining convictions are not void because his Section 2-1401 petitions were untimely filed. (Dckt. #111-14 ¶22). Moreover, this argument confuses the Section 2-1401 statute of limitations with the federal habeas statute of limitations, which McCoy does not otherwise address.

Accordingly, McCoy's grand jury claim is untimely, and the Court declines to reach the merits of this claim.

### B.      McCoy's First and Second Claims Are Meritless.

To establish ineffective assistance of counsel, McCoy must show both (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   The Court need not address both prongs of the *Strickland* analysis "[i]f it is easier to dispose of [the] claim on the ground of lack of sufficient prejudice" alone.   *Morales v. Johnson*, 659 F.3d 588, 600 (7th Cir. 2011), *quoting Strickland*, 466 U.S. at 697; *see also Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020). Prejudice is the only prong that the Court needs to address here.   Under *Strickland*, the prejudice prong requires the petitioner to "affirmatively prove prejudice," such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*

Under Section 2254(d)(1), this Court asks "whether the decision" of the state court "was unreasonably wrong under an objective standard."   *Gage*, 978 F.3d at 529.   "When the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," the federal habeas court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."   *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). Where, as here, the decision of the last state court "does not come accompanied with those reasons," the federal habeas court employs a "look-through presumption" to the last related state-court decision.   *Wilson*, 584 U.S. at 125.   Accordingly, the Court "'looks through' the state appellate court's *Finley* order to the state trial court's ruling when evaluating [McCoy's] arguments."   *Galloway v. Lashbrook*, No. 18 C 2723, 2023 WL 5671617, at *11 (N.D.Ill. Sept. 1, 2023).

14

### 1. The state court reasonably rejected McCoy's first claim.

The state trial court determined that McCoy had not shown prejudice from his trial counsel's failure to pursue the insanity defense. (Dckt. #111-21 at 167–69). The court noted that voluntary intoxication could not qualify as insanity for a legal defense,[2] and that neither McCoy nor Dr. Obolsky had presented evidence that "petitioner had a mental defect or disease traceable to a chronic or habitual use of Ecstasy resulting in a permanent form of insanity." (*Id.* at 167–68). Nor, the court noted, was there evidence that "petitioner's prior use of Ecstasy affected his ability to understand the criminality of his actions" in a lasting manner. (*Id.* at 169). Without any "evidence to support that petitioner's drug habits created a permanent form of insanity," and given McCoy's own testimony about how he "understood, planned, and executed" the robbery that led to Williams' death, the court found any potential insanity defense fruitless. (*Id.*).

McCoy argues that "the two subsequent evaluations" performed by Drs. Obolsky and Kovar "demonstrate [that] had [a] sanity evaluation been ordered there would [be] a finding of insanity at the time of the offense." (Dckt. #96 ¶21). He also argues that "[n]o mental health evidence was offered at trial," that "doctors are not required to present an insanity defense," and that Drs. Obolsky and Kovar presented evidence that McCoy's drug use "would have reasonably been expected to interfere with [his] ability to appreciate the criminality of his conduct." (Dckt. #121 ¶¶11, 30).

McCoy's arguments are unavailing because they apply the wrong standard and are belied by Drs. Obolsky and Kovar's own reports. Habeas relief is only warranted if the petitioner

---

[2] For this same reason, McCoy's argument that "a voluntary intoxication defense . . . should have been considered by counsel at the time" is also unavailing. (Dckt. #96 ¶22).

15

shows that the state court's determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Given this "narrow and exacting standard of review," the Court concludes that the Illinois trial court did not unreasonably apply *Strickland*'s prejudice prong. *Gage*, 978 F.3d at 529.

As McCoy himself admits, (*see* Dckt. #121 ¶¶16, 20–21), neither Dr. Obolsky nor Dr. Kovar opined that McCoy "lack[ed] substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a); (Dckt. #111-21 at 168, 1086). Instead, Dr. Obolsky's evaluation was expressly inconclusive about McCoy's mental state at the time of the alleged crime. (Dckt. #111-22 at 752). Dr. Kovar's evaluation, in addition to declining to conclude that McCoy lacked "substantial capacity," noted, to the contrary, that McCoy appeared to appreciate his conduct's criminality because McCoy explained that he "hatched a plan" to rob people for drugs and/or money, and because McCoy noted that "[he] didn't want to hurt nobody." (*Id.* at 1068, 1086). In addition, Dr. Kovar identified numerous ways that McCoy appeared to exhibit malingering, noting that McCoy had admitted to lying about his hallucinations in order to leave the institution where he'd been hospitalized just a month prior to the shooting. (*Id.* at 1079–81). In short, the reports from Drs. Obolsky and Kovar were inconclusive about—and even harmful to—a finding that McCoy lacked substantial capacity to appreciate the criminality of his conduct at the time of the offense. McCoy thus identifies no evidence that the state court was incorrect "beyond any possibility for fairminded disagreement" in finding that McCoy could not show prejudice from his trial counsel's failure to pursue an insanity defense. *Gage*, 978 F.3d at 529. Accordingly, the Court rejects this claim on its merits.

16

### 2. The state court reasonably rejected McCoy's second claim.

McCoy's second ineffective assistance of counsel claim is also meritless under the governing *Strickland* standard. The state trial court determined that McCoy had not shown prejudice from his sentencing counsel's failure to present mitigating evidence of McCoy's mental health history. (Dckt. #111-21 at 172–73). The court emphasized that "the original presentence investigation detailed petitioner's mental health history" as well as his psychological history, and that Forensic Clinical Services had conducted a fitness evaluation that also made information about McCoy's mental ailments available to the court at sentencing. (*Id.* at 172). With specific respect to Dr. Kovar's report, the court found no theory to support McCoy's contention that it would result in a lower sentence. (*Id.* at 173).

McCoy concedes that his presentence report "referenced the prior hospitalizations, bipolar disorder, and a pretrial attempt at suicide," but contends that the sentencing judge "did not have a clear picture of Mr. McCoy because he did not have all the information;" in particular, sentencing counsel presented "[n]o mental health professionals" and McCoy's family members "ma[de] no mention of mental health issues" at his sentencing. (Dckt. #121 ¶¶13–14, 35–36). He emphasizes Kovar's conclusion that various factors in McCoy's upbringing, medical history, and mental health history would have compromised McCoy's judgment. (*Id.* ¶¶35–36).

McCoy's arguments are, once again, unavailing, primarily because he fails to identify any evidence that was not available to the sentencing judge that would have constituted prejudice by creating a reasonable probability that the result would have been different. *Strickland*, 466 U.S. at 694. The only "new" evidence that McCoy appears to identify is Drs. Kovar and Obolsky's reports, themselves. As McCoy points out, the reports considered much of the same information that was contained in McCoy's presentence investigation report, including his

17

suicide attempts, hospitalization, and mental health diagnosis. "[W]here, as here, the new evidence would barely have altered the sentencing profile presented in the trial court," a petitioner fails to demonstrate prejudice resulting from his trial counsel's failure to present certain evidence. *Laux v. Zatecky*, 890 F.3d 666, 676 (7th Cir. 2018) (cleaned up).

Accordingly, the Court concludes that the Illinois trial court did not unreasonably apply *Strickland*'s prejudice prong in considering McCoy's claim about ineffective assistance of sentencing counsel.[3]

### C. Notice of Appeal Rights and Certificate of Appealability

Petitioner is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed.R.App.P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. If he wishes the Court to reconsider its judgment, however, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed.R.Civ.P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed.R.Civ.P. 6(b)(2).

---

[3] McCoy argues in his reply that the Seventh Circuit's decision in *Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002), compels relief on his claims of ineffective assistance counsel. The Court disagrees. In *Brown*, trial counsel failed to present *any* evidence of petitioner's mental health history to the court altogether. Petitioner had been diagnosed with—and confined, treated, and intermittently medicated for—chronic schizophrenia over many years. *Brown*, 304 F.3d at 680. His court-appointed attorneys failed to procure medical records establishing his psychiatric history, his court-appointed psychologist and psychiatrist overlooked petitioner's past psychiatric records in completing his competency evaluation, the state probation officer neglected to inquire into petitioner's mental health history, and the sentencing judge was subsequently insufficiently informed of petitioner's long-documented history of mental illness. *Id.* There, the Seventh Circuit found that "the glaring absence of even a minimal investigation into Brown's medical history resulted in the impression that he "was someone who made a fictitious claim of suffering from mental illness, when in fact Brown had a long-standing, well-documented history of suffering from chronic schizophrenia." *Id.* at 697. As the record in this case plainly shows, *Brown* is inapposite because the abundant evidence regarding McCoy's mental health was presented to the state courts.

18

A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed.R.App.P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed.R.Civ.P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed.R.Civ.P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed.R.App.P. 4(a)(4)(A)(vi).

The Court declines to issue a certificate of appealability. A certificate of appealability is appropriate only when "the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner cannot make a substantial showing of the denial of a constitutional right, and reasonable jurists would not debate, much less disagree, with this Court's resolution of petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. §2253(c)(2)); *Slack*, 529 U.S. at 484.

## CONCLUSION

For the foregoing reasons, petitioner's habeas corpus petition, (Dckt. #96), is denied. The Court declines to issue a certificate of appealability. The Clerk is instructed to enter judgment in favor of respondent and against petitioner.

**DATE: July 13, 2026**

_____
**Jeffrey I. Cummings**
**United States District Court Judge**

19